UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |
|---|---|---|
| ROBERT GONZALEZ, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 5:23-cv-303-GFVT-EBA |
| v. | ) ) | **MEMORANDUM OPINION** |
| GLENN LUNDY, | ) ) | **&** |
| Defendant. | ) ) ) | **ORDER** |

*** *** *** ***

This matter is before the Court on the Parties' cross-motions for summary judgment by

Plaintiff Robert Gonzalez [R. 27] and Defendant Glenn Lundy. [R. 28.]   Mr. Lundy argues that

the Parties mutually abandoned their contractual relationship or, alternatively, that he validly

terminated the agreement pursuant to the provisions of the contract, and under either argument is

entitled to judgment as a matter of law. [R. 28.]  Conversely, Mr. Gonzalez argues that there was

a valid, ongoing contractual relationship between the parties, the contract was never validly

terminated, that Mr. Lundy breached the contract by failing to compensate Mr. Gonzalez, and

thus is entitled to judgment as a matter of law. [R. 27.]  For the foregoing reasons, this Court will

**GRANT** Mr. Glenn Lundy's Motion for Summary Judgment [R. 28] and **DENY** Mr. Robert

Gonzalez's Motion for Summary Judgment. [R. 27.]

**I**

Plaintiff Robert Gonzalez, who resides in Texas, is a free-lance business consultant and

online systems architect, who "designs digital learning and management platforms for companies

seeking to scale their operations efficiently." [R. 27-1 at 2; R. 27-6 at 5-7.]  Defendant Glenn

Lundy, who resides in Kentucky, is also an entrepreneur; he owns and operates the 800% Club, which "provides services to help owners and managers of car dealerships in the United States and Canada to increase sales. [R. 28-2 at 2-3.]

Gonzalez and Lundy first met while attending a business development conference in Greece, and the two along with their respective families developed a strong personal friendship. [R. 27-5 at 10; R. 28-1 at 2.]  Gonzalez traveled to Kentucky in the summer of 2020 to celebrate the Fourth of July holiday, and during the trip the two men outlined the framework of a business arrangement, which ultimately culminated in the present litigation years later. [R. 27-6 at 10-11.] Leaning on each person's relative expertise, Lundy sought to scale-up the 800% Club more efficiently by developing an online platform where Lundy's clients "could watch [sic] videos rather than Lundy having to repeat himself on video calls with each company." [R. 28-1 at 2; R. 28-2 at 7; R. 27-6 at 9.]  Gonzalez was not tasked with creating new materials, but rather to build an online forum for Lundy's existing content. [R. 28-1 at 59; R. 27-6 at 9-10.]  In other words, from a business standpoint, Lundy could more easily reach a broader client base by sharing pre-recorded videos accessible online.  Neither party sought to bring Gonzalez on as an employee or a full partner in the 800% Club, but rather for Gonzalez to work as an independent contractor. [R. 27-2 at 9-10; R. 28-4 at 8-9; "Article 13 – Relationship of the Parties"]

To memorialize their business arrangement, the two men executed a Project Management Agreement dated June 1, 2021 ("the Agreement"). [R. 27-2; R. 28-4.]  Under the Agreement, Gonzalez was to complete the "Project" as well as perform certain "Project Management Services." [*Id*.]  The "Project" represented the core of the Agreement; Gonzalez would be responsible for the creation of "800% Elite Automotive Club infrastructure" as well as "client management experience." [R. 27-2 at 3; R. 28-4 at 2.]  But Gonzalez was also required to

provide certain "Project Management Services" to Lundy as well. These include "[b]uilding technological platforms, and worksheets to increase dealer experience and efficiency, " "[o]nboarding and soliciting new dealerships," "[c]reating running systems that engage the client, and enhance results," and "[a]ttending both live, and virtual events in order to increase relationships with dealers, and be an active participant in the support of their success." [*Id.*]  The Agreement did not contain a definitive conclusion date; the "Completion Date," refers obliquely to the cessation of Project Management Services and "date in the future that the Project is complete." [*Id.*]  Each of Gonzalez's responsibilities, with respect to both the Project and the Project Management Services, indicate an ongoing, continuous role without an objectively discernible point at which his obligations would be fully performed.  Critical to this case is the provision in the Agreement regarding the compensation Gonazlez would receive in exchange for the performance of the Project and Project Management Services. [*Id.*]  Article 1(E) states that, "[Gonzalez] will receive 30% of the net gross profits generated monthly for each dealership that joins the program, at a minimum monthly fee to the dealer of $4,000, through agreed upon collaborative channels, (i.e., Zurich, Digital Dealer, etc.) on or after June 1st 2021 into perpetuity." [*Id.*]

The business relationship between Gonzalez and Lundy continued unabated until around October 2022.[1]  At this point, Gonzalez had completed the online platform, and the two began to re-negotiate the future of their business relationship, with much of the discussion surrounding compensation. [R. 28-3 at 13-15; R. 28-9; R. 28-10]  Several proposals were raised over the

---

[1] Lundy avers that during this period, he paid Gonzalez the full commission due ("30% of the net monthly profit of clients who joined the program at a minimum monthly fee of $4,000.00 or more per month"), along with an additional 15% commissions for clients who joined the program at a monthly fee of $3,000.00 or less per month. [R. 28-1 at 5.]  This fact is uncontroverted by Gonzalez.  The commissions at issue in this litigation are those that purportedly accrued following the end of the business relationship in December 2022.

course of several months of negotiations.  It was proposed that Gonzalez would expand his involvement, and begin receiving payment from all of Lundy's various businesses underneath the Glenn Lundy, LLC umbrella.  Lundy then proposed an arrangement by which Gonzalez would be paid "5% of the net dollars 800% Elite Auto generated" in total. [R. 28-6.]  In November 2022, Gonzalez stated in email correspondence to Lundy that the two had agreed to a "10/10 plan," by which Gonzalez would receive 10% commissions along with a 10% equity stake in 800% Elite Auto. [R. 28-7.]  By December 2022, as negotiations on the future of the arrangement continued, the relationship between Gonzalez and Lundy soured.  Ultimately, on December 8, 2022, Lundy sent an email notifying Gonzalez that he was terminating their business relationship, and that he would send a final payment of $17,000, which would mark the final payment to Gonzalez for his work.  [R. 28-10; R. 27-6 at 35-36.]  No further communication occurred between the two, and this litigation followed. [R. 27-6 at 36; R. 28-1 at 5.]

On October 27, 2023, Gonzalez filed the present suit, alleging claims of both breach of contract and breach of the implied covenant of good faith and fair dealing against Lundy. [R. 1.] On October 6, 2025, the Parties filed cross-motions for summary judgment. [R. 27; R. 28.] Additional briefing was ordered by the Court on January 7, 2026, to address the potentially dispositive question of whether the Agreement was a perpetual contract, as defined by Kentucky law. [R. 42.]  These motions, along with the supplemental briefing, are ripe for review. [R. 43; R. 44.]

**II**

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the

4

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

The summary judgment standard does not change because a court faces cross-motions for summary judgment. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 312 (6th Cir. 2010) (citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Cross-

motions do not require a court to grant judgment as a matter of law for one party or the other. *Id*.

Rather, a court must consider the merits of each motion and take care to draw all reasonable

inferences against the party whose motion is under consideration. *Id*.

**A**

The parties agree that Kentucky law governs their claims.  Under Kentucky law, the

interpretation of a contract is generally a question of law for the court to decide. *Guagenti v.

James N. Gray Co.*, 105 Fed. App'x 717, 720 (6th Cir. 2004) (citing *Morganfield Nat'l Bank v.

Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992)).  To interpret a contract, "Kentucky

Courts seek to determine the intention of the parties according to the language of the contract."

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 564 (6th Cir. 2008).  A court must construe a

contract as a whole, giving effect to all parts and every word in it if possible. *Howard v. Mercer

Transp. Co.*, 566 F. App'x 459, 461 (6th Cir. 2014) (citing *Jones v. Riddell,* 5 S.W.2d 1077,

1078 (Ky. 1928)); see also *Island Creek Coal Co. v. Wells*, 113 S.W.3d 100, 103 (Ky. 2003).

That said, the clear and unambiguous language of a written instrument controls, and neither party

can attempt to rewrite it. *Id*. (citing *Consol. Jewelers, Inc. v. Standard Fin. Corp.*, 325 F.2d 31

(6th Cir. 1963)).[2]

Unless a contract is ambiguous, a court must strictly construe the written document by its

own terms in accordance with the words' ordinary meaning. *Frear v. P.T.A. Indus.*, 103 S.W.3d

99, 106 (Ky. 2003).  To do so, the court reviews the contents set forth within the contract's four

corners. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002).  A

---

[2] Neither Party suggests that the Agreement contains ambiguous language.  On the contrary, both Gonzalez and Lundy seek to enforce the contract language as written, and attempt to offer extrinsic evidence to suggest that provisions of the Agreement should be interpreted contrary to their plain textual meaning.  Therefore, we proceed by interpreting and applying the Agreement as written, as required by binding precedent.

6

court will only consider parole and extrinsic evidence after determining that a provision is ambiguous. *Id*. Otherwise, evidence involving the circumstances surrounding the execution of the contract, its subject matter, and the conduct of the parties is irrelevant. *Id*.

"A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Id*. A court cannot create ambiguity where none exists. *S. Comfort Waterbeds & Spas, Inc. v. Master Spas, Inc.*, 2024 WL 2595952, at *2 (W.D. Ky. Aug. 9, 2004) (citing *Frear*, 103 S.W.3d at 106). Nor can a party create ambiguity by asserting, after the fact, that the contract failed to state what was truly intended. *Id*. As a question of law, the Court decides whether a contract is ambiguous. *Flowers*, 513 F.3d at 563 (citing *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006)). Simply put, a matter of contract interpretation does not go to the jury unless reasonable alternative interpretations exist. *Colvin v. Magnum Drilling of Ohio, Inc.*, 1991 WL 78759, at *2 (6th Cir. May 15, 1991) (citing *Cook United Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974).

Mr. Lundy offers two theories to support his argument that he was no longer bound by the terms of the Agreement, and therefore cannot be held liable for breach. First, Lundy claims that "upon completion of the online platform," the Parties effectively abandoned the Agreement, ceased operating under its terms, and began a process of negotiating a new agreement that never came to fruition. [R. 28-1 at 5-6.] Second, Lundy asserts that even if the parties remained bound beyond completion of the online platform, Gonzalez materially breached the Agreement, allowing Lundy to unilaterally terminate the Agreement according to its terms. [R. 28-1 at 6-7.] Resolution of each argument requires an interpretation of the Agreement's terms. The issue is squarely resolved, however, by resort to a third legal principle – that the Agreement was one in perpetuity and thus was properly terminable by either party at will.

**1**

Lundy first posits that because the online platform was completed, and the parties had begun to engage in negotiations over the future of their business relationship, the parties had impliedly abandoned their existing Agreement, and were no longer bound by its terms. A finding that the parties here impliedly abandoned the Agreement through their conduct is unsupported by the record, however.

Under Kentucky law, parties to a contract may mutually agree to terminate the agreement at "any time." *Aronson v. Gibbs-Inman Co.*, 140 S.W.2d 806, 809 (Ky. 1940); see also *Turf Town Properties, Inc. v. Isaacs*, 2025 WL 2810268, at *3 (Ky. Ct. App. Oct. 3, 2025) (same); see also *Glazer v. Lehman Bros. Inc.*, 394 F.3d 444, 460 (6th Cir. 2005) ("It is a fundamental precept of contract law that parties may agree to discharge or terminate a contract in favor of creating a second agreement to replace the former, and, when that occurs, the initial agreement is superseded and is no longer enforceable as to any party thereto"). A mutual agreement to rescind a contract need not be itself an explicit agreement between the parties; rather, a contract "may be rescinded or discharged by acts or conduct of the parties inconsistent with the continued existence of the contract[.]" *Texaco Inc. v. Debusk*, 444 S.W.2d 261, 263 (Ky. 1969) (citing 17 Am. Jur. 2d, *Contracts*, § 494). Thus, "mutual assent to abandon a contract may be inferred from the attendant circumstances and conduct of the partes." *Id.* Mutual abandonment by implication "may be shown by the conduct of one party inconsistent with the continued existence of a contract or abandonment or repudiation of the contract, and knowledge of, and acquiescence to, such abandonment or repudiation by the other." *BLC Lexington SNF, LLC v. Oatis*, 2019 WL 6221006, at *8 (E.D. Ky. Nov. 20, 2019) (citing *GGNSC Louisville Hillcreek, LLC v. Estate of Cramer*, 932 F.3d 480, 487 (6th Cir. 2019)). Yet, proof of such abandonment must be "clear and

convincing." *Dalton v. Mullins*, 293 S.W.2d 470, 475 (Ky. 1956); see also *L.K. Comstock & Co., Inc. v. Becon Const. Co., Inc.*, 932 F.Supp. 906, 932 (E.D. Ky. 1993) (same).

Lundy posits that upon the completion of the online platform, the parties mutually abandoned the Agreement and began the ultimately unsuccessful process of negotiating an entirely new contract. [R. 28-1 at 5-6.]  Looking to *GGNSC Louisville Hillcreek*, Lundy argues that Gonzalez's proposed new arrangement signified an act "inconsistent with the continued existence" of the Agreement, which Lundy knowingly acquiesced to by engaging in negotiations over a new contract.  Consequently, Lundy argues that the Agreement terminated at this time because the conduct of the parties implied that they had abandoned it at this time.

A closer examination of *GGNSC Louisville Hillcreek* reveals that it is clearly distinguishable from the case at bar.  In that case, the central question was whether "rejecting a new offer that is identical to an older offer terminate acceptance of the prior offers in a contract[.]"  *GGNSC Louisville Hillcreek*, 932 F.3d at 486-87.  An identical contract was presented to the Bramer family on three separate occasions, and on the third occasion the Bramers refused to sign it. *Id*.  The Sixth Circuit, applying Kentucky law, concluded that a party's refusal to sign an identical contract to the one that was presently in effect, "clearly bespeak[s] a mutual intent to abandon the Agreement." *Id*. at 487.  Thus, with the intent of the parties clearly demonstrated by their abandonment of the existing agreement, they were no longer bound by its provisions from the time of abandonment.

But unlike the parties in *GGNSC Louisville Hillcreek*, neither Gonzalez nor Lundy presented the other with an identical contract as the Agreement at issue, which was then rejected by the other party.  Merely because Gonzalez began to negotiate with Lundy over the future of their business relationship, including the possibility of a new contractual agreement, does

9

evidence an abandonment of the Agreement already in place.  Essential to the Court's holding in *GGNSC Louisville Hillcreek* was the fact that the rejected third contract was entirely identical to the contract already in place, such that its rejection on the third occasion demonstrated that the parties no longer sought to be bound by its terms. *Id*. at 486-87.  The proposed arrangement that resulted from the negotiations between Gonzalez and Lundy was quite different from the existing Agreement – so different, in fact, that it soured their business relationship.  In his own words, Lundy was "disappointed with Gonzalez's continuing attempts to obtain more and more benefits from the arrangement."  The mere fact that Gonzalez sought to modify the terms of the business relationship does not envisage an abandonment of the existing Agreement.

Rather, the existing Agreement remained in place and in effect until such time as the parties either substantively amended the Agreement or agreed to a novation, replacing the existing Agreement with an entirely new one.  That time never came, however.  In fact, the key differences that Gonzalez sought in the business relationship opened an irreparable chasm between the two, and culminated in this litigation.  In the absence of a new contract to replace the existing one, nor an agreed-upon amendment to the existing contract, the Agreement between Gonzalez and Lundy continued in its unmodified form.  Lundy presents no further evidence to demonstrate an abandonment, beyond Gonzalez's attempt to engage in negotiations over a future, considerably different, business arrangement.  This, standing alone, falls well short of demonstrating that the parties abandoned the Agreement.

**2**

Next, Lundy argues that even if the contract between the parties was not mutually abandoned upon completion of the online platform, Lundy nonetheless validly terminated the agreement according to its provisions.  More specifically, Lundy claims that Gonzalez materially

10

breached the Agreement, and was incapable of curing his breach within the 14-day cure window, and thus Lundy was permitted to unilaterally terminate the Agreement. [R. 28-1 at 6-7.]

The Agreement provides that it "may be terminated by either party, upon notice in writing," if one of three circumstances occur. [R. 27-2 at 9; R. 28-4 at 8.]  Relevant here, a party may terminate the agreement, "if the other party commits a material breach of any term of this Agreement that is not capable of being remedied within fourteen (14) days or that should have been remedied within fourteen (14) days after a written request and was not."  Thus, in order for this termination provision to be triggered: (1) the party not seeking termination must have materially breached a term of the Agreement, and (2) the breach must be either incapable of remedy within fourteen days or was not remedied within fourteen days of a written request.  And notice of the termination must be given to the other party "in writing."

Lundy posits that Gonzalez materially breached the contract by failing to perform one of the defined "Project Management Duties," specifically, by his failure to "onboard and solicit new dealerships." [R. 28-1 at 6.]  On December 8, 2022, Lundy terminated the Agreement with Gonzalez on this basis stating in an email to Gonzalez that he was, "choosing to go another route to service our training platform needs." [R. 28-10.]  The email further informed Gonzalez that this rift in their business relationship was caused, at least in part, by his failure to bring any new dealers into the program. *Id*.  Lundy further argues that this termination notice complied with the requirement that it be in writing, and that because Gonzalez would be unable to turn around his lackluster performance in recruiting new dealers to the program, a fourteen-day cure window was neither required, nor feasible. [R. 28-1 at 6-7.]

Gonzalez, in turn, takes issue with both the method and justification for termination offered by Lundy. [R. 29 at 5-6.]  First, in his view, the December 8, 2022, email did not

constitute "written notice," as required by Article 12 of the Agreement.  He also contends that Lundy was required to permit him fourteen days to cure the alleged breach, which his email did not allow for.  Lastly, Gonzalez posits that "onboarding and soliciting new dealerships" was beyond the scope of the "Project Management Services" required by the contract.  Thus, in Gonzalez's view, termination was not possible here because he did not breach the Agreement, because he was not required to onboard and solicit dealerships.

**a**

We first address whether the December 8, 2022, email constitutes a "writing," sufficient to satisfy the requirement of Article 12 of the Agreement.  Unfortunately, but unsurprisingly, "writing," is not a defined term within the Agreement, nor is there any provision regarding the sufficiency of a writing to comply with this provision.  Upon a cursory examination of both federal law and Kentucky law, however, we easily conclude that Lundy's email constituted "a writing," within the meaning of the Agreement.

Under the Electronic Signatures in Global and National Commerce ("E-SIGN") Act, which applies "to any transaction in or affecting interstate or foreign commerce," "a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form."  15 U.S.C. § 7001(a); see also *Sawyer v. Mills*, 295 S.W.3d 79, 87-88 (Ky. 2009) (applying the E-SIGN Act to a contract formed under Kentucky law).  Under the Act, an "electronic record," refers to "a contract or other record created, generated, sent, communicated, received, or stored by electronic means." 15 U.S.C. § 7006(4).

While the Agreement itself does not provide clarity as to what satisfies the "in writing" requirement to terminate for cause, the E-SIGN Act squarely resolves whether the mere fact that the notice of termination was in email form prevents it from having legal effect.  The E-SIGN Act applies to the Agreement between Gonzalez, a citizen of Texas, and Lundy, a citizen of Kentucky, because it is a services contract between citizens of different states and thus, "affect[s] interstate or foreign commerce."  An email is clearly an "other record … communicated … by electronic means."  Thus, the E-SIGN Act provides that the mere fact that the communication was sent by electronic, as opposed to traditional print, methods cannot prevent it from having legal effect on that basis alone.  Applying that standard here, Lundy's email to Gonzalez terminating the business relationship for cause cannot be denied legal effect merely because it was sent by electronic means, as opposed to a physical document.

**b**

We next turn to whether Gonzalez's failure to onboard or solicit new dealerships constitutes a material breach of the Agreement, sufficient to allow for its termination by Lundy.  Beginning first with the contract language, it is clear that "[o]nboarding and soliciting new dealerships," was explicitly listed as one of the "Project Management Services," under Article 1(B) of the Agreement which Gonzalez was required to perform. [R. 27-2 at 3; R. 28-4 at 2.]  Yet, as Gonzalez aptly observes, this provision is shocking in its lack of specificity.  The provision does not provide a minimum quota of how many new dealerships Gonzalez was expected to onboard.  It provides no definitive end date on which Gonzalez will no longer be expected to provide any of the Project Management Services.  Its presence alongside a list of other "Project Management Services," including "creating running systems that engage the client, and enhance the results," and "attending both live, and virtual events in order to increase

13

relationships with dealers, and be an active participant in the support of their success," sound less like defined, measurable performance goals and more akin to generalized expectations, ancillary to the core of the contractual relationship.

"A 'material breach' is one that goes to the essence of the contract and makes it impossible for the other party to perform." *Morel Const. Co., LLC v. Richardson Bulldozing, LLC*, 2014 WL 3548144, at *3 (Ky. Ct. App. July 18, 2014) (citing 23 Williston on Contracts § 63:3 (4th ed.)).  Under Kentucky law, determining "whether a failure to render or to offer performance," constitutes a material breach of the contract requires an examination of several circumstances:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Bluegrass Equine and Tourism Foundation, Inc. v. Com.*, 2013 WL 1919567, at *15-16 (Ky. Ct. App. May 10, 2013) (citing Restatement (Second) of Contracts, § 241).  An examination of each of these factors in view of the Agreement between Gonzalez and Lundy clearly points to the fact that a failure to "onboard and solicit new dealerships" does not rise to the level of a material breach.

Determining the benefit of what Lundy reasonably expected to receive from the Agreement requires the Court to examine the core of the contractual relationship between the parties.  It is important to reiterate, at this juncture, that the Agreement clearly distinguishes

14

between the "Project" and the "Project Management Services." [R. 27-2 at 3; R. 28-4 at 2.]  The "Project," defined as "800% Elite Automotive Club infrastructure, and client experience management," represents the centerpiece of the business arrangement.  This much is largely undisputed by either party; after all, the creation of the online platform was the impetus of the business arrangement, and neither party claims the platform was incomplete or non-conforming.  The separately defined Project Management Services demonstrates that Lundy expected there to be an ongoing business relationship between himself and Gonzalez beyond the completion of the "Project", but fails to define the scope of these expectations.  It states that Gonzalez was expected to "onboard [sic] and solicit [sic] new dealerships," but exactly how many Gonzalez was expected to bring in was entirely unclear.  The same is true for the other "Project Management Services."  For example, Gonzalez was expected to "creat[e] running systems that engage the client, and enhance the results."  What kind of systems were expected?  How would Lundy determine whether results were enhanced?  What degree of enhancement would constitute a satisfactory performance?  These questions remain unanswered by the Agreement.  What is contemplated, however, is the centrality of the "Project" – the creation and management of the online platform – to the Agreement.  Thus, the completion of the Project was a clearly defined expectation of the contract.  Beyond that, in the absence of clear performance expectations, it would be unreasonable for Lundy to expect anything further.

This complete lack of specificity also renders it impossible to determine the extent to which the injured party can be compensated.  Compensation owed to Gonzalez was not based upon how many new dealerships he personally onboarded or solicited to become a client of Lundy's.  Nor was Gonzalez to be compensated based upon how many new "running systems" he created, nor based upon how many live and/or virtual events he attended to engage with

15

Lundy's clients.  Rather, Gonzalez was to be paid "30% of the net gross profit generated monthly for each dealership that joins the program, at a minimum monthly fee to the dealer of $4,000, through agreed upon collaborative channels (i.e., Zurich, Digital Dealer, etc.) on or after June 1, 2021 into perpetuity." [R. 27-2 at 3; R. 28-4 at 2.]  If, for example, the contract required Gonzalez to bring in a minimum of five clients at a minimum monthly fee of $4,000 or more to the business each quarter, damages suffered as a result of a breach would be more readily discernible.  But that is not the case here.  Rather, Gonzalez was required to "onboard [sic] and solicit [sic] new dealerships," without more.  The harm caused to Lundy by virtue of this breach cannot be readily determined, and it is unclear how he could be compensated for this breach.

Turning to the third factor – it is clear that Lundy will not suffer forfeiture by virtue of Gonzalez's failure.  Pivoting, then, to the fourth factor it is highly unlikely that the breach – a failure to solicit or onboard dealerships – could be adequately cured at all, let alone within the fourteen-day window contemplated by the Agreement. Again, this factor is further complicated by the lack of specificity in the Agreement.  How many dealerships would Gonzalez need to solicit to cure the breach?  Would Lundy be satisfied that a breach had not occurred if Gonzalez were to now solicit a single dealership to join?  This is unclear – due to the lack of any definite terms as to any of the Project Management Services.  So, in short, while it is clear a breach occurred here by virtue of Gonzalez's failure to solicit or onboard *any* dealerships – which neither party contests – the lack of specificity renders it impossible to determine whether the breach could be cured at all.  It is entirely unclear what level of performance Gonzalez would have to render to cure his breach.

Lastly, the fifth factor looks at whether the breach constitutes a failure to comport with the standards of good faith and fair dealing, which are implicit in every contract formed under

16

Kentucky law.  Gonzalez has also brought a separate claim for a breach of the duty of good faith and fair dealing against Lundy, which is discussed in greater detail in a later section.  Here, in contrast, our focus looks at whether Gonzalez failed to engage in good faith and fair dealing when he failed to "onboard [sic] and solicit [sic] new dealerships."  The focus of this factor requires determination of whether the breaching party acted in bad faith.  When examining whether this covenant is breached, one must determine whether the breaching party engaged in conduct which "would destroy or injure[] the other party's right to receive the fruits of the contract," or "denied the benefit of the bargain originally intended by the parties." *Breeders' Cup Limited v. Nuvei Technologies, Inc.*, 2023 WL 6131445, at *2 (E.D. Ky. Sep. 19, 2023) (citations omitted).

Evaluation of this element is a somewhat close call, but likely cuts in favor of a finding of materiality.  Importantly here, Gonzalez does not dispute that he failed to solicit or onboard any dealers during his time as an independent contractor.  On the contrary he urges that he was not required to do so, despite unambiguous language to the contrary within the Agreement. [R. 29 at 6-7.]  While, as we have discussed, the exact parameters and expectations of how many clients he was expected to solicit remain altogether unclear, what is clear is that he was required to onboard at least *some* dealerships. (emphasis added).  His failure to do so, either by virtue of negligence or purposeful disregard, certainly "injured [Lundy's] right to receive the fruits of the contract," – in this context, additional clients and revenue.  Even though the precise measure of full performance is entirely opaque, the failure to render any performance as to the requirement of "onboard[ing] and solicit[ing] new dealers," strongly suggests a breach in bad faith.

Yet, weighing these five factors, the Court concludes that Gonzalez's failure to onboard or solicit new dealerships does not constitute a material breach of the Agreement, and therefore

17

does not trigger the provision of Article 12 allowing the non-breaching party to terminate the Agreement for cause.  Gonzalez's failure to onboard and solicit new dealerships does not go to the central objective of their business relationship – the "Project" – which required the completion and maintenance of the online platform.  That Gonzalez did so is not in dispute.  Due to the lack of clarity as to the quantity of dealers to be solicited, or the deadline by which Gonzalez had to onboard them, his breach does not result in a quantifiable damages calculation.  And although his failure to solicit any dealership certainly signifies a breach of the contract, and could point toward a breach in bad faith, it does not, by itself, render the breach material.  Consequently, Gonzalez's failure to onboard and solicit new dealerships is a breach, but not a material one.

c

Lastly, in order for Lundy to have properly terminated the Agreement for cause pursuant to Article 12 of the Agreement, the breach had to have been incurable within fourteen days of written notice.  We need not belabor this analysis because, for the reasons already stated, Gonzalez's failure to onboard and solicit new dealerships did not constitute a material breach of the Agreement; thus, the provision that allowed either party to terminate the Agreement for cause was not triggered.  But, again, as stated above in the materiality analysis, the complete lack of specificity regarding performance of the Project Management Services renders it impossible to determine whether the breach could be cured at all.  The contract left entirely unspecified how many dealerships Gonzalez needed to onboard and solicit in order to satisfy this contract obligation.  Consequently, it is indeterminable what Gonzalez would have to do cure the breach.  Once more, although a breach of this term is clear from Gonzalez's failure to solicit *any*

18

dealerships, it is equally unclear how many he would be required to onboard to constitute full performance.

To summarize, Lundy attempted to terminate the Agreement for cause, pursuant to Article 12 of the Agreement, through his December 8, 2022, email to Gonzalez.  Although Lundy's email constituted a writing, as required by the termination for cause provision of the Agreement, the provision was inapplicable here because Gonzalez's failure to onboard and solicit dealerships did not constitute a material breach of the Agreement.  Consequently, Lundy was not able to terminate the Agreement for cause.

**3**

Even though neither party directly raised the issue in their original briefing, this case is squarely resolved in favor of Defendant Lundy because it was a perpetual contract, by its very terms, and was thus terminable at will by either party to the Agreement.  In order to afford both Parties the opportunity to brief this additional issue, additional arguments on this question were ordered by the Court on January 7, 2026. [R. 42.]  Both Parties filed their supplemental briefs on January 21, 2026, and were considered by the Court in reaching its decision. [R. 43; R. 44.]

As a matter of public policy, the law of Kentucky "does not favor contracts running into perpetuity."  *Electric and Water Plant Bd. of City of Frankfort, Ky. v. South Central Bell Telephone Co.*, 805 S.W.2d 141, 143 (Ky. Ct. App. 1990).  Rather, under Kentucky law, "if a contract covers no definite period, it may be terminated by either party at will." *Id*. (citing *Brownsboro Road Restaurant, Inc. v. Jerrico, Inc.*, 674 S.W.2d 40 (Ky. Ct. App. 1984)); see also *Braddom v. Three Point Coal Corp.*, 157 S.W.2d 349, 352 (Ky. 1941) ("it is founded upon the general rule that a contract covering an indefinite period is terminable at the will of either

19

party"); see also *Kirby v. Scroggins*, 246 S.W.2d 453, 455 (Ky. 1952) ("[the contract] covered an indefinite period, therefore was a contract at will and could be terminated at any time by either of the parties"). This rule carries a narrow application; courts should only construe a contract as indefinite where such an interpretation is "compelled by the unequivocal language of the contract." *Id.* (citing *Mid-Southern Toyota, Ltd. v. Bug's Imports, Inc.*, 453 S.W.2d 544 (Ky. 1970)). Contracts that run into perpetuity, "should be terminable after a reasonable time." *Mid-Southern Toyota*, 453 S.W.2d at 549.

The necessity for such a rule appears to lie in the difficulty in ascertaining the intention of the parties in a contract that lacks a definite time horizon. In *South Central Bell*, the Kentucky court stated:

> [G]enerally, where the parties to a contract express no period for its duration and none can be implied from the nature of the contract or from the circumstances surrounding them, the only reasonable intention that can be imputed to the parties is that the contract may be terminated by either on giving reasonable notice of his intention to the other.

*South Central Bell*, 805 S.W.2d at 143 (citing 17 Am. Jur.2d Contracts, 486, "Duration and Expiration of Contract" (1964)). In that case, two utility providers, South Central Bell and the Frankfort Plant Board entered into a contract in 1943 under which the two utilities would share the utility poles that each one owned, for a cost of $1.00 per pole each year. *Id.* at 141-42. The contract contained a termination provision, stating that the contract could be terminated "by either party at any time upon one year's notice in writing to the other party," but notwithstanding the termination, "this agreement shall remain in full force and effect with respect to all poles jointly used by the parties at the time of such termination." *Id.* at 142. Thus, under this "grandfather provision," there was no discernible expiration date for when the joint use of the original poles would end. When, in 1986, South Central Bell sought to terminate the joint use of

20

all poles, the Plant Board sought to invoke the "grandfather provision," claiming that the parties must continue to jointly use all existing poles that existed at the time of the notice of termination. *Id*. at 143. The Court rejected this argument, concluding that the "grandfather provision," "extend[ed] into perpetuity," by its unambiguous terms. *Id*. at 144. The Court observed, "[a]s worded, the arrangement will continue forever." *Id*. at 143. Consequently, the agreement was terminable at will by either party, and South Central Bell properly terminated the agreement with proper notice. *Id*.

In contrast, when this Court last addressed a purportedly indefinite contract provision in *Taylor v. University of the Cumberlands*, we concluded that the provision at issue was not sufficiently unambiguous to deem it a contract in perpetuity. *Taylor v. University of the Cumberlands*, 2017 WL 512643 (E.D. Ky. Feb. 7, 2017). There, the University terminated its employment contract with Dr. James Taylor, the University President of more than thirty-five years. *Id*. at. *1. At issue was a provision of Dr. Taylor's contract, by which the University agreed to provide Dr. Taylor and his wife with "compensation for life following Dr. Taylor's retirement from the position of President." *Id*. at *2. After Dr. Taylor rejected the University's proposed amendment to this Agreement, the University terminated the Agreement and ceased paying Dr. Taylor's retirement benefits, prompting him to bring suit. *Id*.

Among several other arguments, the University contended that the Agreement to pay Dr. Taylor and his wife benefits for life "has no definite end date and, thus, is terminable at will," under Kentucky law. *Id*. at *6. This Court, applying the legal standard under *Brownsboro* and *South Central Bell*, rejected the University's argument. *Id*. Unlike the contract provisions at issue in *Brownsboro* and *South Central Bell*, the agreement between Dr. Taylor and the University had a discernible termination date – namely, the death of Dr. Taylor and his wife. *Id*.

21

Although the date of the Taylors' passing was not yet known, it is "certainly not one existing in perpetuity." *Id*. Consequently, because the termination date of the agreement was unambiguously tied to a "definite yet unascertainable period," the contract was not terminable at will. *Id*. A contract for the life period of another, therefore, does not extend "in perpetuity;" the mortality of man necessitates the existence of a future date on which the contract, like the life of its signatory, will conclude. *Id*.

In contrast to the agreement at issue in *Taylor*, the Agreement reached between Gonzalez and Lundy carries into perpetuity. This conclusion is forced by a reading of the Agreement's unambiguous terms. Article 1(E) (the "Fees Provision"), at the center of this dispute, is explicit in its indefiniteness. It states:

> [Gonzalez] will receive 30% of the net gross profit generated monthly for each dealership that joins the program, at a minimum monthly fee to the dealer of $4,000, through agreed upon collaborative channels, (i.e., Zurich, Digital Dealer, etc.) on or after June 1, 2021 into perpetuity.

[R. 27-2 at 3; R. 28-4 at 2.] Not only does the text of the Agreement clearly state that payments to Gonzalez would carry on "into perpetuity," but Gonzalez does not shy away from this seemingly unfavorable fact. In fact, the perpetual nature of the Fees Provision forms the very basis of his claim. The Fees Provision does not state that payments to Gonzalez would carry on so long as the online platform he designed and constructed was utilized, nor did it even purport to provide compensation to Gonzalez for the rest of his life. Instead, it provided that Gonzalez would receive 30% of the profit for any dealership who paid Lundy more than $4,000 per month, "in perpetuity." Presumably, then, if we adopted Gonzalez's view he would be entitled to a sizeable minority of Lundy's business profits forever, and to his heirs and assigns after him.

22

Not only is the Fees Provision a contract provision that carries into perpetuity, the performance of services in the Agreement as a whole also lacks a definite termination date. The form language in the lead up to the substance of the Fees Provision defines the term "fees" to "refer to the payment [Lundy] will pay to [Gonzalez] for the rendering of Project Management Services." This begs the question: Can a discernible end date be detected by looking to the termination date after which Project Management Services will no longer be performed? No – because such a termination date does not exist there either. Even a most generous reading of the Agreement's provisions cannot suggest a definite conclusion point, as noted previously, because both the "Project"[3] and "Project Management Services" clearly contemplate an ongoing, dynamic business relationship between Gonzalez and Lundy without a clear termination date.

Nor can a termination date be discerned from the ironically titled, yet frustratingly unhelpful, Section 1(D) which purports to define the "Completion Date" of the Agreement. Once again, one step forward and two steps back. The term "Completion Date" is defined to mean "the date that [Gonzalez] will complete or cease the provision of Project Management Services to [Lundy]." [R. 27-2 at 3; R. 28-4 at 2.] At this point, in view of the indefinite nature of the Project Management Services to be performed, the definition essentially states: The Agreement is over when its over. Not very insightful. Yet, it continues, "[t]he Completion Date is currently unknown, and for the purposes of this Agreement, will mean that date in the future that the Project is complete." So, is the Completion Date the date on which Project Management

---

[3] Again, the "Project" is a defined term at Section 1(A) to refer to: "800% Elite Automotive Club infrastructure, and client experience management." As stated earlier in this Opinion, the language of this provision suggests that Gonzalez's involvement in Lundy's business extended beyond mere completion of the core of the Agreement – the building of the online platform. Rather, when viewed in conjunction with the subsequent section regarding Project Management Services, it is clear that Gonzalez was to perform ill-defined client-focused roles in the business for an indefinite period thereafter. Although the scope and nature of these roles and responsibilities remain opaque at best, what is clear is that there was no contemplated termination date or performance goal which would have demonstrated that the Agreement was fully performed.

23

Services are no longer performed?  Or is it the date when the Project is completed?  Nobody knows – not even the signatories to the Agreement.  But in the end that doesn't matter, because regardless of whether the "Completion Date" is by reference to the completion of the Project or the cessation of Project Management Services, we still reach the same outcome.  Neither the Project or Project Management Services have a defined end point, or even a point at which either party could objectively conclude that the services were fully performed.

So, in short, the "Completion Date" provision, much like the Fees Provision, terminate in reference to events which themselves do not have a discernible end point.  Put simply, one cannot define an end point by reference to something that itself lacks an end point; to do so is to create a never-ending logical fallacy.  Alas, the dizzying puzzle of cross-references leads us to the same conclusion: the performance provisions of the Agreement, just like Fees provisions of the Agreement, both are contractual provisions that carry into perpetuity, and are thus terminable at will by either party.

Gonzalez's reliance upon the Sixth Circuit's holding in *Shane* is misplaced. [R. 43 at 9.] The Sixth Circuit's holding in *Shane* reinforces, rather than undermines, the conclusion reached here. *Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 402 (6th Cir. 2006).  In *Shane*, the Court determined that the plaintiff's complaint failed to state a claim for breach of contract "because it failed to state any contractual basis for his claim that he was entitled to commissions from [the Defendant] in perpetuity or that [the Defendant] was unable to terminate their agreement at will." *Id*.  Thus, the Court concluded that "because it lacked any term about its duration, the [agreement] is terminable at will by either party at will." *Id*.  Gonzalez attempts to rely on *Shane* for the proposition that the Court will only construe a contract as covering no definite period where it is silent as to duration.  But the rule is not so narrow.  Rather, as the

Court in *Shane* reiterated, "[t]he general rule is that a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract." *Id*. (quoting *Mid-Southern Toyota*, 53 S.W.2d at 549). This rule applies regardless of whether the contract is silent as to duration or whether, as here, it explicitly purports to extend for an indefinite period by its very terms. At bottom, the Court must construe the contract as conferring a right in perpetuity, because that conclusion is forced by the unequivocal language the Parties elected to agree to in the contract. *Shane* supports, rather than contradicts, this conclusion.

Although the Court must construe any ambiguity in the contract's terms against the drafter, Lundy, doing so does not materially alter the analysis. Again, as already stated, the Agreement is not ambiguous – the Fees Provision explicitly carries "into perpetuity," and the Completion Date provision provides that performance will cease by reference to perpetual obligations lacking an end date. Put simply, there remains no ambiguity which requires construction against Lundy as the drafter. That Lundy seeks to use the "perpetual" language as a sword rather than a shield, as Gonzalez contends, is of no consequence. Nothing suggests that Lundy, or even Gonzalez, placed the perpetual verbiage in the Agreement as a trap for the unwary. Frankly, the evidence suggests that it was put there because the business relationship between the two men remained fluid and changing and was intentionally designed to be flexible for both parties. The resulting biproduct of this flexibility is the opportunity for both parties to terminate the Agreement and pursue other opportunities. The mere fact that Lundy utilized the authority to terminate the Agreement and go in a different direction does not mean that he somehow breached the Agreement or operated in bad faith. Mutual agreement to terminate is not required to terminate such a perpetual contract, either party can unilaterally do so at-will; Gonzalez was as equally entitled to this remedy as Lundy.

25

Throughout his briefing, Gonzalez effectively requests that this Court provide him with a portion of the revenues Lundy accrued by using the platform Gonzalez built and maintained, from his December 2022 rift until Lundy ceased using the platform.  But to do so would require the Court to read-in additional language to the Agreement that is simply not there.  And because the language that is there is not ambiguous, any resort to extrinsic evidence would be improper.  For example, the Fees Provision does not say that he will receive payment "until such time as Lundy ceases to use the platform(s) constructed and maintained by Gonzalez."  It merely states that these payment obligations carry on "in perpetuity."  Without the right to terminate the Agreement, then, Lundy would have to pay Gonzalez a sizable portion of his profits forever, without end.  If Gonzalez wanted to clarify that the continuance of payment was contingent on Lundy's usage of the platform, he could have done so when the Agreement was first drafted.  Instead, the Agreement, as written, contained no such language and instead obligated Lundy to a perpetual obligation.  To somehow restrain the perpetual language to apply solely as long as Lundy used the platform would require the Court to impart ambiguity where none exists.  The Agreement as written is unambiguously perpetual.

The December 8, 2022, email exchange between Gonzalez and Lundy is sufficient to validly terminate the Agreement.   With respect to this correspondence, Gonzalez raises several points.  First, he states that the email exchange "confirms the existence of the underlying 'perpetuity' arrangement."  Specifically, he contends that "[t]his statement is significant because it is an admission that the commission agreement existed and included express 'in perpetuity' terms. [R. 43 at 12.]  This, however, further reinforces the Court's conclusion that the Agreement is terminable at will by either party.  Rather than suggesting that the Parties intended their business relationship to continue forever, the evidence present in the record suggests that the

26

Parties utilized the language as a matter of flexibility, to respond to the evolving nature of their business relationship.  Had Gonzalez and Lundy sought to create a permanent, collaborative framework under which Gonzalez would permanently receive a portion of Lundy's gross profits, they would have entered into some other form of business relationship (i.e., a partnership or a limited liability company), an idea specifically rejected by the Agreement.  Instead, the Agreement makes clear that Gonzalez was an independent contractor of Lundy's, contracted to perform a limited scope of services.  The perpetual language, therefore, was designed to afford flexibility to the relationship upon completion of the platform, rather than to memorialize some permanent, intractable profit-sharing arrangement.  The mere fact that the Parties were aware they included perpetual language does not alter this arrangement.

Second, Gonzalez contends that the language of the email exchange demonstrates a "unilateral decision to stop working with Gonzalez and to stop paying him," and as such, "is not the kind of termination Kentucky law contemplates." [R. 43 at 12-13.]  Kentucky law contemplates that termination of an at-will agreement must be "reasonable." *South Central Bell*, 805 S.W.2d at 143.  While a reasonableness standard leaves some degree of subjectivity in view of the circumstances, our conclusion here that the termination was reasonable is guided by the termination provision in the Agreement itself.  Although the termination provision applied by its terms to terminations for cause, it still provides valuable insight to what the Parties considered to be a reasonable termination.  In short, the termination provision required only that it be in writing.  The email exchange squarely satisfies that requirement.

The reasonableness of the method of termination is further demonstrated by the nature of the business relationship between Gonzalez and Lundy.  Gonzalez had fully performed his primary duty as an independent contractor under the Agreement – the construction of the web

27

platform – and their continued relationship involved the service and maintenance of that platform in perpetuity.  Compensation for this maintenance would be in the form of a portion of the profits yielded from the platform's use.  Gonzalez was already compensated for his past performance related to the platform's initial development.  Once Lundy concluded, for any reason, that these continued services were no longer required, he was entitled to terminate the Agreement.  It would be nonsensical to place upon Lundy an initial obligation that he continue to allow Gonzalez to service the platform for another thirty days, for example, in order for the termination to be effective.  At bottom, this contract for services was terminable at will at any time, by either party, for any reason.  And, under the circumstances, the Court can conclude that the written termination embodied in the email exchange was "reasonable."

Next, Gonzalez contends that the email exchange between himself and Lundy demonstrates a pattern of "unfairness" that Lundy has perpetuated throughout the litigation.  More specifically, he contends that "Lundy sought to keep the benefits of Mr. Gonzalez's completed work while cutting off Mr. Gonzalez from the ongoing compensation that was the point of the bargain." [R. 43 at 13.]  This argument somewhat misses the point.  The Court will not opine on the propriety of Lundy's business practices, or whether they comported with the standards in this industry.  Rather, the Court's review is restricted only to the legality of the termination.  Viewed through that lens, the fact that "Gonzalez's work would continue to benefit the company" does not alter the fact that the Parties entered into a perpetual services contract, which are terminable at will. [*Id.*]  Although the Court appreciates that Gonzalez would prefer to extract additional income from the platform he designed, this does not change the fact that Lundy was entitled to lawfully terminate the Agreement at any time.  It is also worth noting in terms of fairness, however, that Gonzalez possessed this same right.  Had a business opportunity arisen

28

which would have been more lucrative to Gonzalez, he also could have terminated the Agreement to pursue other opportunities. So, although Gonzalez perceives Lundy's treatment as unfair, because he hoped the Agreement could remain ongoing, it is worth pointing out that both Gonzalez and Lundy possessed the same inherent rights regarding its termination.

Finally, Gonzalez contends that the email exchange "support[s] Plaintiff's core argument that the commission obligation did not end merely because Lundy decided he was 'done' with the relationship." [R. 43 at 13-14.] This argument is circular, and again insists that the email exchange did not effectuate a valid termination of the Agreement and, thus, "[t]he commissions … continued to accrue at least until Lundy actually terminated the agreement…" [*Id*. at 14.] However, as already stated, Lundy was entitled to terminate the agreement at-will, and his email to Gonzalez constituted a valid termination. Again, the lawful termination of this perpetual Agreement concluded the accrual of additional commission obligations effective immediately. And, Lundy had already compensated Gonzalez for all past obligations.

To summarize, Lundy is entitled to judgment as a matter of law – he did not breach the contract by terminating it and ceasing to pay Gonzalez after December 8, 2022, because the Agreement between the two was terminable at will by either party. Put differently, the Agreement was terminable at will and Lundy validly terminated the Agreement. This holding is forced by the finding that the Agreement contained no discernible end date by its terms; both its performance requirements and compensation provisions carried into perpetuity. Contrary to Lundy's arguments, the parties had not mutually abandoned the Agreement prior to December 8, 2022; nor was Lundy entitled to terminate the Agreement for cause, because Gonzalez did not materially breach the Agreement by failing to onboard and solicit new dealerships. But neither abandonment nor proper termination for cause were required. Rather, either Gonzalez or Lundy

29

was free to walk away from the Agreement at any time, upon providing proper notice to the other party.  Lundy did just that on December 8, 2022, terminating the Agreement without cause via email, paying Gonzalez the balance of money owed for services performed, and terminating Gonzalez's access to Glenn Lundy LLC business infrastructure.  Consequently, Lundy is entitled to judgment as a matter of law.

C

We next turn to the gravamen of Gonzalez's Motion for Summary Judgment – that a valid contract existed between himself and Lundy, and that Lundy breached the contract by improperly terminating the Agreement and ceasing to pay Gonzalez. [R. 27-1 at 9-11.]  We need not belabor this argument, because it is effectively resolved by looking at the converse of our resolution of Lundy's Motion for Summary Judgment.

Neither party disputes that a valid, written agreement existed between Gonzalez and Lundy.  Yet, contrary to Gonzalez's assertions, Lundy did not materially breach the Agreement by "with[holding] commissions that were contractually due."  That is because Lundy was permitted to terminate the Agreement at will, because, as already discussed, the Agreement was a contract entirely lacking an end point, and thus a contract in perpetuity.  As a result, Lundy could not have committed a breach by terminating the Agreement on December 8, 2022, and ceasing to pay Gonzalez, because he was legally entitled to do so.  Consequently, absent a breach of contract by Lundy, Gonzalez is not entitled to judgment as a matter of law.

D

In every contract created under Kentucky law, there is an implied duty of good faith and fair dealing. *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991).  That duty

30

requires parties "to do everything necessary to carry [the contract] out." *Id.* (citing *Beech Creek Coal Co. v. Jones*, 262 S.W.2d 174 (Ky. 1953)). In other words, "contracting parties are deemed to have promised to 'refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.'" *Back v. Chesapeake Operating, LLC*, 2018 WL 737609, at *2 (E.D. Ky. Feb. 6, 2018) (quoting *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F. Supp. 2d 629, 636 (E.D. Ky. 2012)). "In order to show a violation of the implied covenant of good faith and fair dealing, a showing of breach of contract is ordinarily not required; rather, the party asserting the violation must 'provide evidence to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *O'Kentucky Rose B. Ltd. v. Burns*, 147 F. App'x 451, 457-58 (6th Cir. 2005) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2004)).

Kentucky allows parties to simultaneously plead, as separate claims, general breach of contract and breach of the implied duty of good faith. *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp.2d 807, 817 (E.D. Ky. 2013). However, to recover damages for both breach of the overall contract and breach of the implied duty of good faith, the aggrieved party must show misconduct by his partner that is distinct from the actions that breached the express terms of the contract. See *Back v. Chesapeake Operating, LLC*, 2018 WL 737609, at *3 (E.D. Ky. Feb. 6, 2018) (misrepresenting profits and expenses for purposes of calculating royalty payments did not establish a separate claim for breach of the implied duty where the breach of contract claim was also premised on express requirement to pay royalties); *Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop. Corp.*, 2015 WL 4464105 at *5 (W.D. Ky. July 21, 2015) (dismissing as duplicative good-faith claims based on failure to provide notice and failure to properly terminate where also asserted as breach of contract

31

claims); *Watson v. Progressive Direct Ins. Co.*, 2022 WL 18027628, at \*10 (E.D. Ky. Dec. 30, 2022) (dismissing claims related to calculation of vehicle resale value under an insurance contract as duplicative). This rule against duplicative contract claims comports with Kentucky's policy against double recovery. See *Metro Louisville/Jefferson Cnty. Gov't v. Alabama*, 326 S.W.3d 1, 12 (Ky. Ct. App. 2009) (quoting 22 Am. Jur. 2d, *Damages*, § 35).

Gonzalez posits that Lundy violated the implied duty of good faith and fair dealing through his "lack of honesty, fairness, and fidelity to the bargain." [R. 27-1 at 11.] To support this characterization of Lundy's conduct, Gonzalez points specifically to the fact that Lundy "abruptly terminated Plaintiff's role, revoked his access to client systems, and withheld earned commissions." These arguments, however, are essentially identical to those that Gonzalez made in his claim for breach of contract. In essence, Gonzalez seeks to take two bites at the apple through the filing of both a breach of contract claim, and a claim for the violation of the covenant of good faith and fair dealing, both premised upon the same conduct. Such a claim is clearly barred by Kentucky's aforementioned "policy against double recovery." Even so, such a claim would almost certainly fall short on the merits for the same reasons Gonzalez's breach of contract claim faltered.

Gonzalez also attempts to support an argument that the covenant of good faith and fair dealing was violated due to a discovery dispute by which Lundy denied the existence of the Agreement for some period, only disclosing it upon its discovery in his email inbox during a deposition. [R. 29-1 at 1-2, 10; R. 33 at 1-2.] In response, Lundy attributes this failure to disclose to mere accident, stating that it was forgotten because "the parties never operated in accordance with the Agreement." The reasons for this mishap remain in dispute, but even if Lundy's failure to disclose the document were intentional, it is not actionable as a violation of

32

the covenant of good faith and fair dealing.  This covenant is focused on the performance of duties required by the contract itself. See *Ranier*, 812 S.W.2d at 156.  It does not pertain, however, to a party's failure to comport with discovery requirements during the course of litigation. See e.g., Fed. R. Civ. P. 37.  Thus, we need not reach the question here as to whether the failure to disclose the Agreement for an extended period is actionable at all, because regardless, it is not actionable as a breach of the covenant of good faith and fair dealing.

### III

Although such "pat-on-the-back" business arrangements remain commonplace, especially in the entrepreneurial space, this case serves as a cautionary tale that such business relationships come with inherent risks.  Form contracts may present a convenient way to quickly draw up a business relationship without the need for legal counsel.  Yet, the effectiveness of such contracts is limited by their generality and lack of specificity; and the application of their provisions can inadvertently result in costly litigation.  This is especially true where, as here, the parties ascribe their names to indefinite contracts in their personal capacities.  Haphazardly constructed contracts rarely afford themselves to clear-cut resolution if, or when, the business relationship sours.  Accordingly, for these reasons, it is hereby **ORDERED** as follows:

1. Plaintiff Robert Gonzalez's Motion for Summary Judgment **[R. 27]** is **DENIED**;

2. Defendant Glenn Lundy's Motion for Summary Judgment **[R. 28]** is **GRANTED**;

3. Trial in this matter is **CANCELLED**;

4. Defendant Glenn Lundy's Motion in Limine **[R. 26]** is **DENIED AS MOOT**;

5. The Plaintiff's Motion to Strike Witness List **[R. 37]** and the Defendant's Motion to Amend/Correct **[R. 38]** are **DENIED AS MOOT**;

6. Judgment in favor of Defendant Glenn Lundy will enter promptly.

This the 12th day of June 2026.

Gregory F. Van Tatenhove
United States District Judge